UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA,
OCALA DIVISION

| | |
|---|---|
| James Aren Duckett,<br><br>        Plaintiff,<br><br>v.<br><br><br>William Gladson, State Attorney of the Fifth Judicial Circuit of Florida,<br>et, al.,<br><br>        Defendants.<br>_____/ | Civil Action No.<br>Emergency Injunction Sought<br><br><br>**Emergency Injunctive Relief Sought Execution Scheduled July 28, 2026, at 12:00 p.m**. |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF PURSUANT TO 42 U.S.C. § 1983

BRITTNEY N. LACY
Assistant CCRC-South
*lacyb@ccsr.state.fl.us*

COURTNEY M. HAMMER
Assistant CCRC-South
*hammerc@ccsr.state.fl.us*

Capital Collateral Regional
Counsel - South
110 SE 6th Street, Suite 701
Fort Lauderdale, Florida 33301
Tel. (954) 713-1284
*ccrcpleadings@ccsr.state.fl.us*

MARY E. WELLS
Law Office of M.E. Wells LLC
623 Grant Street SE
Atlanta, GA 30312
*mewells27@comcast.net*
Tel. (404) 408-2180

July 22, 2026

1

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF PURSUANT TO 42 U.S.C. § 1983

Pursuant to 42 U.S.C. § 1983, Plaintiff James Aren Duckett, a prisoner under sentence of death, hereby sues Defendants, William Gladson, James Uthmeier, Mark Glass, and Peyton C. Grinnell each in their official capacity (collectively, the "State Actors"), and states:

### INTRODUCTION

1. For forty years, Mr. Duckett—who the State of Florida intends to execute in less 6 days—has steadfastly insisted that he was not responsible for the 1987 sexual battery and murder of Teresa McAbee. Absent judicial intervention, Florida will execute Mr. Duckett without allowing him the opportunity to test available and probative DNA evidence that could prove his innocence.

2. Mr. Duckett' conviction is based entirely on circumstantial evidence. No physical evidence links Mr. Duckett to Ms. McAbee's murder.

3. In 2003, during Mr. Duckett's postconviction proceedings, the Florida Supreme Court remanded his case to determine whether DNA testing of the victim's clothing was possible. The circuit court permitted testing of additional intimate items pursuant to the parties' agreement.

2

*See* Order, SC01-2149 (Fla. Mar. 21, 2003); (PC-R1-SV. 2245-49). However, due to the limitations of technology and the condition of the evidence, the Florida Department of Law Enforcement ("FDLE") was unable to obtain any probative testing results. FDLE's Analyst Emily Booth agreed not to test a slide that contained biological material extracted from the victim's underwear for fear that the technology was not advanced enough to yield results.

4.    Under warrant, Mr. Duckett immediately moved to process the slide using modern advances in technology. The circuit court agreed and granted Mr. Duckett's motion, finding that the results of the DNA testing would likely be admissible at trial or a future hearing, "that identity was an issue at trial, and that if DNA testing of the sperm indicated that it did not belong to [Mr. Duckett], there would have been a reasonable probability of an acquittal." (WR1. 748). The State did *not* dispute that the results of the testing would be admissible (WR1. 747).

5.    The court however, permitted the State "to exercise complete control over the location, timing, and method of [that] testing." *Duckett v. State*, 431 So. 3d 990, 992 (Fla. 2026). The court refused to permit an evidentiary hearing concerning the biological testing, the scientific

capabilities and limitations of the testing laboratory, the laboratory's knowledge regarding the inadequacy of the selected testing methodology, and the reliability of the reported results. This resulted in the use of a technology unsuitable for the analysis required in this case and an inconclusive result.

6.     After losing what was the best evidence capable of exonerating him, Mr. Duckett sought DNA testing of similar items that would provide a comparable means of identifying the true perpetrator (WR3. 36). He also filed an additional postconviction claim alleging that the State's actions during the prior DNA testing resulted in the destruction of key exculpatory evidence central to establishing his innocence and violated his right to due process (WR3. 1).

7.     In response to his motions, the Governor reset Mr. Duckett's execution for two weeks later on July 28. It was not until then that the lower court acknowledged Mr. Duckett's filings and, after hearing brief argument, denied any additional testing and postconviction relief (WR3. 212).

8.     This action challenges Florida Rule of Criminal Procedure 3.853 (Rule 3.853) as applied and as applied to Mr. Duckett by the state

courts.

9.     Against clear statutory authority and in violation of Mr. Duckett's constitutional rights, the State denied Mr. Duckett's requests. By unreasonably denying and limiting Mr. Duckett reasonable access to the forensic evidence that can support a meritorious challenge to his conviction and death sentence and the procedures to allow him such access, Defendants have deprived Mr. Duckett of reasonable and effective use of the postconviction relief procedures that Florida has chosen to make available to its convicted citizens under state law. *See, e.g., Guitierrez v. Saenz*, 606 U.S. 305 (2025); *Skinner v. Switzer*, 562 U.S. 521 (2011); *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52 (2009). Accordingly, this suit seeks to address Defendants' violations of Mr. Duckett's constitutional right to due process by denying him access to the evidence for forensic testing ahead of his imminent execution.

## PARTIES

10.     Plaintiff James Aren Duckett is a citizen of the United States and resident of Florida. He is currently incarcerated by the Florida Department of Corrections at Florida State Prison in Starke, Florida under a sentence of death issued by the Lake County Circuit Court. He

5

is scheduled to be executed on July 28, 2026.

11.   Defendant is William Gladson, the State Attorney of the Fifth Judicial Circuit and is responsible for prosecuting Mr. Duckett. He is being sued in his official capacity. A state attorney who opposes forensic testing is a proper defendant in a section 1983 action seeking such testing. *See Skinner*, 562 U.S. 521.

12.   Defendant is James Uthmeier, the Office of the Attorney General of Florida and is also responsible for the prosecution of Mr. Duckett. He is being sued in his official capacity. An attorney general who opposes forensic testing is a proper defendant in a section 1983 action seeking such testing. *See Skinner*, 562 U.S. 521.

13.   Defendant is Peyton C. Grinnell, Sheriff of the Lake County Sheriff's Office and is in possession of several of the pieces of evidence subject of Mr. Duckett's motion for postconviction. He is being sued in his official capacity.

14.   Defendant is Gary J. Cooney, Clerk of the Lake County Clerk's Office and is in possession of several of the pieces of evidence subject of Mr. Duckett's motion for postconviction. He is being sued in his official capacity.

15.   Defendant is Mark Glass, Commissioner of the Florida Department of Law Enforcement and is in possession of several of the pieces of evidence subject of Mr. Duckett's motion for postconviction and conducted analysis of pieces of evidence in this case. He is being sued in his official capacity.

## JURISDICTION AND VENUE

16.   The Court has jurisdiction over the claims brought in this action under 28 U.S.C. §§ 1331, 1343, 2201, and 42 U.S.C. § 1983. *See also Skinner v. Switzer*, 562 U.S. 521, 534 (2011).

17.   Venue is proper under 28 USC § 1391(b)(2) because the State Actors are all engaged in the actions at issue in this District, and several of the State Actors are residents of the District.

## STATEMENT OF FACTS[1]

18.   Mr. Duckett was convicted of the sexual battery and murder

---

[1] Citations to the record are as follows:

Direct Appeal to the Florida Supreme Court filed 1989 (R. __);

Postconviction Record on Appeal to the Florida Supreme Court and proceedings after remand, SC01-2149 (PC-R1. __) and Transcripts (PC-R1-T. ___) and (PC-R1-SV. ___);

Successive Postconviction Record on Appeal to the Florida Supreme Court, SC13-719 (PC-R2. ____);

Successive Postconviction Record on Appeal to the Florida Supreme Court, SC16-793 (PC-R3. __);

of Teresa McAbee and sentenced to death following a jury trial and a jury advisory recommendation for death by a vote of 8-4.

20.    On May 12, 1987, Ms. McAbee's body was discovered in a pond less than one half mile from her home. Ms. McAbee's body was found fully clothed, face down in the lake past her home. The medical examiner determined that she had been sexually assaulted, strangled, and drowned. She had not been seen since the previous night when she had gone to a store near her home to purchase a pencil.

## A.    The Night of Ms. McAbee's Disappearance

20.    The night before Ms. McAbee's body was discovered, on May 11, Mr. Duckett was working the night shift as a police officer in the small town of Mascotte, Florida. At around 10:30 p.m. Mr. Duckett was running radar on Highway 50 across the street from the Circle K convenience

---

Warrant Records on Appeal to the Florida Supreme Court: initial proceedings and circuit court's summary denial of Mr. Duckett's motion for postconviction relief, SC2026-0449 (WR1. ___) and confidential supplemental (WR1-S. ___); summary denial of Mr. Duckett's postconviction DNA proceedings, SC2026-0528 (WR2. ___), supplemental (WR2-S. ___), and sealed (WR2-S2. ___); and consolidated appeal of the circuit court's summary denial of Mr. Duckett's motion for postconviction DNA testing and successive motion for postconviction relief alleging the State destroyed the best evidence in the case, SC2026-1083 (consolidated appeal with SC2026-1084) (WR3. ___).

store. The Circle K sat on the corner of Highway 50 and Sunset Drive. To the left of the Circle K, and in the same building, was a laundromat, and to the right of the building, on the same side as Sunset Drive, was a dumpster.

21.    While sitting there, Mr. Duckett noticed a young girl and a young boy standing behind the dumpster (R. 1682). Mascotte had a curfew, and based upon the apparent youth of the two individuals, Mr. Duckett decided to go across the street and speak with them. Mr. Duckett parked in front of the store and went into the store to ask the clerk if she knew the name and age of the girl (R. 557, 1683). The clerk told Mr. Duckett the girl's name was Teresa and that she thought she was 10 to 13 years of age (R. 557). The boy with her was Salvador Calisto. Mr. Duckett then went back outside and asked the two to come speak with him (R. 557-58, 1683). They stood in front of Mr. Duckett's police car while he spoke with them (R. 636). Ms. McAbee told him that she was 11 and Calisto told him that he was 16 (R. 613, 1684). Soon after Calisto's uncle arrived and Mr. Duckett and the uncle spoke about his nephew (R. 1685-86). Calisto and his uncle then gathered their laundry and left (R. 616, 639).

9

22.    Mr. Duckett asked Ms. McAbee to sit in the police car so he could speak with her further (R. 1684). Mr. Duckett explained to Ms. McAbee that she should not be at the store at that time of night and told her she needed to go home (R. 1687). Mr. Duckett made notes of the interview in his police notebook, noting that Ms. McAbee was wearing a white and tan sweater and that she was eleven years of age (PC-R1, D. Ex. 16). Ms. McAbee then exited the car and left to walk around the dumpster behind the store in the direction of her home (R. 1687). Ms. McAbee's home was less than 400 feet behind the Circle K, on Sunset Drive (R. 513, 896).

23.    Several persons were at the Circle K at this time, each of whom reported that Mr. Duckett got back into his car after Ms. McAbee left and drove off alone down Highway 50 towards Groveland, in the opposite direction of Ms. McAbee (R. 1656). Some of these people testified at trial, and some of them did not. Nonetheless, with one glaring exception which will be discussed infra, all agreed that Mr. Duckett left the Circle K without anyone in his car and headed in the opposite direction as Ms. McAbee and her home.

24.    At about midnight, Ms. McAbee's mother reported her

10

daughter missing to the police. She had checked at the Circle K earlier and been told that her daughter had left around 10:30-10:45 p.m. She went to the Groveland Police Station where she spoke with an officer and explained that she believed her daughter was missing (R. 589-90). Mr. Duckett was called on his police radio and returned to the Mascotte Police station to meet with Ms. McAbee where he took a statement from her concerning the last time that she had seen her daughter and what her daughter was wearing at this time (R. 535). Ms. McAbee filed a missing person's report and went home (R. 520).

25.    Mr. Duckett went to Ms. McAbee's mother's home about 15-20 minutes later to get a picture of her daughter (R. 520, 1696-97). He returned to the police station where he made a flyer with the photo, which he then took to the Circle K and two other local convenience stores (R. 721-22, 673, 678). He then went to the home of Calisto and asked if he knew the location of Ms. McAbee (R. 642). Calisto told him he had not seen her since he left the Circle K.

26.    Around 1:00 a.m., Mr. Duckett called his police chief, Michael Brady, and told him about the report and asked if there was anything further they should do (PC-R1. 224, 227; R. 741, 1697). Mr. Duckett

11

erroneously believed the girl was probably hanging out with some friends and had failed to tell her mother, but he continued to look for her (PC-R1. 225). He also resumed his regular duties, including handing out some tickets to speeding motorists (R. 708-9, 711-12). At the end of his shift, Mr. Duckett again reported to Chief Brady and then went home to sleep.

27.    The next morning a local man spotted a body in a small lake in the orange grove located approximately 3,200 feet behind the Circle K (R. 897). The man found Chief Brady and took him back to the lake, where Brady confirmed that the body was that of Ms. McAbee (PC-R1. 231; R.758, 775). The Chief then informed the Lake County Sheriff's Office ("LCSO") of the discovery. It was initially unclear which agency had jurisdiction of the case but was subsequently determined that the LCSO would be in charge of the investigation. Chief Brady called Mr. Duckett at his home and informed him of the discovery. Mr. Duckett asked the Chief if he should come in but was told no. Thus, Mr. Duckett did not arrive at the scene until later that day.

28.    Based on nothing more than a personal hunch, LCSO investigator Chuck Johnson decided on May 11 that James Duckett was somehow involved in the homicide ("the feeling was there"), and any

12

chance of investigating other suspects then ceased. Despite knowing this, Mr. Duckett voluntarily met with LCSO officers and gave a statement (R. 1279). Mr. Duckett was subsequently indicted for the murder of Ms. McAbee.

## B.   The State's Case Falls Apart in Postconviction

29.   The case against Mr. Duckett was entirely circumstantial and consisted of four central components: Grace Gwendolyn Gurley [Gurley], the only witness who puts the victim driving off in Mr. Duckett's car; a pubic hair found on the victim that was allegedly consistent with Mr. Duckett's; tire tracks found at the scene that allegedly matched those found on the police car Mr. Duckett was driving; and, fingerprints of Ms. McAbee that were found on the hood of Mr. Duckett's police car. Because of the limitations of forensic testing in 1987, the State was unable to properly test a vast majority of the evidence collected from Ms. McAbee and the area surrounding where she was found, and instead, the State presented unreliable circumstantial evidence in the case against Mr. Duckett.

### i.   *Gwen Gurley*

30.   In October of 1987, five months after the crime, the person

who would become the key witness for the state, Gurley, came to light. At that time Gurley was an inmate in the Leesburg Jail awaiting disposition on a charge of violation of probation. After seeing an account of Mr. Duckett's arrest on television, she mentioned to one of the officers that she was from that area and knew Mr. Duckett (PC-R1, D. Ex. 4, pp. 7-8). She did not tell the jail officer that she had observed anything relevant to the disappearance of Teresa McAbee on the night of May 11, 1987 (PC-R1, D. Ex. 4, p. 8). Gurley was visited by persons from the LCSO right after she spoke to the officer in the jail (*Id.*). From this point on, the officers and prosecutors visited Gurley several times at the jail to speak about the case and even removed her from the jail on various occasions to visit with family and her boyfriend or to just get a meal (*Id.* at 9, 10, 12, 15-19, 37-38).[2] By the time of Mr. Duckett's trial in May of 1988, the work had paid off. The state now had a witness who could place Ms. McAbee in Mr. Duckett's car.

---

[2] Jail records, memos in Assistant State Attorney ("ASA") Hurm's personal file and other witnesses confirm that Gurley was visited on several occasions by persons from the LCSO and that she was also removed from the jail on several occasions by these same persons. (*See* PC-R1. 1321, 1338, 1341). This critical *Brady* information was never disclosed to the defense prior to trial (PC-R1. 1276).

14

31.    In postconviction, Mr. Duckett presented compelling evidence that none of the evidence used to convict him was valid. Gurley was the sole witness to place Ms. McAbee in Mr. Duckett's car. The State's theory was that Mr. Duckett left the Circle K store, drove around the block and picked her up. This unlikely sequence of events was necessary because every other witness who was at the Circle K that night states that Mr. Duckett drove off alone after speaking with the victim. The clerk from the Circle K, Shirley Williams, testified that Mr. Duckett was driving off alone when she arrived at the Circle K between 10:30 and 10:40 pm (R. 1656). By testifying that she saw Mr. Duckett driving off with a young person in his car, Gurley provided the missing link.

32.    The problem with Gurley's version of events is that it was not true. This critical piece of evidence is nothing more than a story arrived at between Gurley and a representative from the LCSO. Following trial, Gurley admitted in six separate statements, including a sworn deposition and a sworn affidavit, that the testimony she gave at Mr. Duckett's trial was not true. In a deposition taken by trial attorney Jack Edmund post-trial, Gurley explained that she agreed to lie at trial because the prosecution team told her that she would not do as much time if she

cooperated with them (*Id.* at 19). To ensure that her story rang true, the prosecution team took her to the Circle K, showed her where to say she was standing and showed her what road she allegedly traveled that night (*Id.*). LCSO investigator Rocky Harris told her where to say Mr. Duckett's car was parked and exactly what to say about what she had allegedly seen that night (*Id.* at 14, 20-21, 37). There was no question in Gurley's mind that the prosecution team knew she was lying because a) they told her what she needed to say and b) she specifically told them that the whole story about what she had allegedly seen was a lie (*Id.* at 35, 39). Gurley was told she had to stick with this story at trial or risk further prosecution (*Id.* at 26, 35).  With the exception of one interview with state investigators post-trial, (PC-R1, D.Ex. 6) , an interview that contained no details about the actual events of May 11, 1987, or her trial testimony in May of 1988—Gurley has confirmed this recantation in every statement she has made post-trial. In the third of these subsequent interviews, Gurley confessed that she had been told to go to the bathroom if she was not sure of an answer and that someone from the state would be there to help her, and that she did do this during her testimony (*Id.*) . Gurley signed an affidavit at that time admitting that she lied at trial and even

made a slight change in this affidavit to ensure that it was perfectly accurate (*Id*. at 1354; D.Exh. 40).

33.   There is a wealth of evidence that corroborates Gurley's recantations, as opposed to her trial testimony. No trial witnesses corroborated Gurley's version of events. Both witnesses who were with Gurley on the night Ms. McAbee was last seen discount Gurley's account of events on that night and neither of those witnesses support Gurley's assertion that she ever saw Ms. McAbee in Mr. Duckett's car. Vickie Davis testified in the state court evidentiary hearing that Gurley asked her to lie in her statement to assist Gurley in gaining an early release from jail (PC-R1. 1326) . When Gurley was subpoenaed to testify in postconviction regarding her trial testimony, she encountered a Florida law that would find her guilty of perjury if she changed her trial testimony in any manner, regardless of whether or not she was telling the truth, so she opted to exercise her Fifth Amendment Right to remain silent. Mr. Duckett asserts that the Court must look to the recantation she provided under oath, prior to the change in the perjury laws, to learn the truth.

ii.       *Michael Malone – The hair*

34.    FBI Agent Michael Malone was the linchpin of the State's case.   He testified that the pubic hair found on the victim was microscopically identical to Mr. Duckett's hair. The State emphasized Malone's testimony in both opening and closing statements, arguing that with Malone's testimony, they had proven their case (R. 203, 1897). Mr. Duckett has asserted throughout trial and postconviction that this testimony concerning the hair evidence was false and misleading and should not have been presented to the jury.

35.    Before Malone even got the hair evidence, it had already been examined by the Florida Department of Law Enforcement ("FDLE") who concluded they were not able to make a match between the question hair and Mr. Duckett's known hair. Faced with no match, the State made the unprecedented move to expert shop and sent the hair to Malone, contrary to FBI rules in place at that time. Malone was able to make the match that was apparently sought by the State and testified to that during the trial. Although trial counsel made efforts to impeach Malone through cross examination, his efforts were rebuked by Malone who stayed firm in his testimony.

18

36.   In April of 1998, the Department of Justice ("DOJ") issued a report which detailed many deficiencies within the FBI Laboratories, including problems within the field of hair microscopy. The report outlined several problems within the laboratories, including, but not limited to, problems with Malone's testimony in a 1985 hearing relating to former U.S. District Judge Alcee Hastings. Mr. Duckett presented this evidence to this Court in an effort to show that Malone was not trustworthy but again, both the FBI and Malone stuck with their testimony. Mr. Duckett also presented evidence that Malone had knowingly violated FBI policy when he retested the hair evidence in this case after it had been tested by the FDLE. Mr. Duckett presented further evidence that the chain of custody of the hair was destroyed by the expert shopping in the case.

37.   Due to concerns about the scope of review done by the DOJ in the initial report and the failure to analyze each case evaluated by Malone, the DOJ and FBI began sending out independent examiners to retest evidence in each capital case in which Malone had worked as an expert. Defense counsel were not notified of this review and only became aware of it happening if the prosecutor on their case informed them of

said results. Mr. Duckett's counsel were not notified by the State in his case and his counsel only found out these reviews were happening when she learned from other defendants that they were having their cases independently reviewed. Since the State provided no information, counsel ultimately called the FBI directly to learn why Mr. Duckett's case was not being reviewed. It was only when Mr. Duckett's counsel notified the FBI that his case had been missed did the independent examiner, Steve Robertson, do the review of his case.

38. After conducting the exam, the examiner concluded that all areas of Malone's work and testimony he had been asked to review raised concerns. Mr. Duckett raised these issues.

39. On August 27, 2014, counsel for Mr. Duckett received a letter from Norman Wong, Special Counsel for the DOJ, dated August 22, 2014, informing counsel that the DOJ had undertaken another review of Malone's testimony in Mr. Duckett's case. "[W]e have determined that a report or testimony regarding microscopic hair comparison analysis containing erroneous statements was used in your case." DOJ letter to State Attorney King, August 15, 2014. Prior to this, Duckett had been left out of every reexamination, and the only review of his case was done

because counsel retained Robertson to conduct a review. The DOJ's 2014 review of Duckett's case differed significantly from the review done by Robertson in 2011, both in scope and in findings. Included with that letter were the results from the FBI review of Malone's testimony, the materials upon which the FBI relied in their review, a response from the Innocence Project and NACDL, and a copy of the August 14, 2014, letter to Brad King.

40.    The 2014 review of Malone's testimony in Mr. Duckett's case came about when the FBI commenced an internal review of microscopic hair analysis cases to determine the extent to which flawed evidence may have tainted convictions following a trio of DNA exonerations in Washington, DC (from 2009-2012). All three of the exonerated defendants were convicted on FBI microscopic hair comparison evidence which turned out to be wrong. The FBI estimated that approximately 21,000 cases involved microscopic hair analysis would be reexamined. In July of 2012, the DOJ publicly announced this historical review.

41.    The FBI flagged Mr. Duckett's case to determine if it "exceeded the limits of science by overstating the conclusions that may appropriately be drawn from a positive association between evidentiary

hair and a known sample." After conducting the review, the FBI found repeated instances of two separate errors; (1) the examiner assigned to the positive association a statistical weight or probability or provided a likelihood that the questioned hair originated from a particular source, or an opinion as to the likelihood or rareness of the positive association that could lead the jury to believe that valid statistical weight can be assigned to a microscopic hair association–this type of testimony exceeded the limits of the science; and (2) the examiner cites the number of cases or hair analyses worked in the laboratory and the number of samples as predictive value to bolster the conclusion that a hair belongs to a specific individual-this type of testimony exceeded the limits of science. For example, the report found the following two statements were errors under their protocol: "…therefore, I concluded that the hair from the panties is consistent with having originated from Mr. Duckett, (R. 1004, line 3-4, Error 2); and "I would say that it would be a very high probability that it does. Or to reverse it, I would say the chances of it being from somebody else, other than Mr. Duckett would be highly unlikely at best." (R. 1011, line 7-18, Error 2).

42.    The documents provided by the DOJ in this report are directly

on point and support the allegations that Mr. Duckett has asserted throughout the proceedings—that the jury heard false and misleading testimony concerning the hair analysis. Additionally, the documents clearly undermine the Florida Supreme Court's previous findings as to the reliability of Malone's testimony and the determination that Malone did not overstate the results of the hair analysis.

43.    At the same time that the DOJ and FBI were analyzing the hair analysis evidence in Mr. Duckett's case, the Office of the Inspector General (OIG) was compiling an assessment of the previous Task Force review of the FBI Laboratory. The results of that review were published in July of 2014 in An Assessment of the 1996 Department of Justice Task Force Review of the FBI Laboratory (OIG Report). That Assessment provides a background for the review of Malone's testimony in Mr. Duckett's case and an explanation for how the review of cases such as Mr. Duckett's came to occur. In the OIG Report, the FBI publicly conceded that testimony offered for decades by its hair examiners has been exaggerated and is scientifically invalid with respect to the significance of the claimed link between a suspect's hair and a crime scene hair.

44.    The Report also provides a blistering critique of Malone's misconduct in the field of hair microscopy, finding Malone "handled a disproportionately large number of cases" and provided seriously flawed analysis and testimony in many cases the Task Force Reviewed." (PC-R3. 120). Indeed, "[w]e found that, of the 13 FBI lab examiners whose cases the Task Force reviewed, Malone's conduct was the most egregious." *Id.* Malone "repeatedly created scientifically unsupportable lab reports and provided false, or inaccurate testimony at criminal trials." *Id.* The 2014 OIG report found a deficiency in the previous review undertaken in 1997 because DOJ did not direct the Task Force to review all cases involving Malone who was known as being "consistently problematic." The 2014 OIG report recommended such a review.

45.    The documents contained in the assessment reflect that in approximately 96% of the cases reviewed, Malone was criticized for the testimony he provided as to hair analysis—testimony similar to the testimony he provided to Mr. Duckett's jury. (PC-R3. 161). Specifically, Malone was rebuked for testifying to statistically invalid rates of error. *Id.* And, Malone was criticized for misleading courts and fact finders as to the science behind hair analysis, i.e., that a particular number of

24

characteristics were needed to make a "match." (PC-R3. 165-66).

46.    Malone's comparison and conclusions were not based on any research or literature and were completely fabricated to support his opinions. In Mr. Duckett's case, Malone told the jury: "Most normal hairs, average hairs, will have about twenty individual microscopic characteristics. You have a hair with twenty characteristics, you have got a very good hair to work with" (R. 991). This statement was false.

47.    Malone was also highly criticized for failing to use appropriate tests in a scientifically acceptable manner, and for providing unsupportable testimony on the basis of his bench notes, lab reports or accepted standards in the scientific community. There is no question that, had this information been available at the time of trial, Mr. Duckett would have been acquitted of all charges. The agency which hired Malone, the agency which trained Malone, the agency which put forth Malone as an expert in the field of hair microscopy has now categorically stated that Malone's testimony in Mr. Duckett's case was not true.

48.    The State conceded as much at a previous hearing: "And the State is not contesting, you know, we're not hearing [sic] backing Malone's testimony. It's well accepted that it's come out subsequently

25

that he overstated the hair analysis comparison, but we knew about that in the first successive postconviction motion" (PC-R3. 379).

49.    The tire track and fingerprint evidence were also firmly refuted in postconviction proceedings. The State's entirely circumstantial case against Mr. Duckett has crumbled.

## C.    Collection and Processing of Forensic Evidence Relevant to this Complaint

50.    As part of his examination of Ms. McAbee's body, the medical examiner collected her underwear and jeans and provided them to FDLE for analysis. The medical examiner also collected vaginal swabs and created a smear of those vaginal swabs. The medical examiner likewise collected fingernail scrapings from both of Ms. McAbee's hands.

51.    FDLE serologist Margaret Tabor examined the evidence in this case upon its collection in 1987. She examined the vaginal swabs, which were labeled as Q43, for the presence of semen and none could be found. Chemical tests indicated the presence of blood; however, the record does not indicate any testing was done on the blood.

52.    Tabor identified male reproductive cells, sperm, on the jeans identified as Q5 (R. 1266-67). A cutting was made of the area showing the sperm and stored. The jeans were further examined for the presence of

26

blood, and Tabor reported none could be found. It is unclear what tests Tabor performed to determine whether blood was present. FDLE did not conduct any further grouping tests due to the condition of the jeans. The jeans were sent to Lifecodes Corporation. Lifecodes analyzed a stain, and using technology in 1987, was unable to yield any detectable DNA.

53. The underwear were identified as Q6. Tabor identified male reproductive cells, and chemical tests indicated the presence of blood. Again, FDLE did not conduct further grouping tests due to the condition of the item. The underwear were sent to Lifecodes Corporation and processed, wherein "insufficient high molecular weight human DNA was isolated."

54. Tabor extracted biological evidence from cuttings of the underwear and mounted them onto slides pre-trial in 1987. One slide is identified as Exhibit 14, Q6(3), sub. 001. No attempt was made to test for DNA at the time of trial because DNA testing was not sophisticated enough to test that minute amount.

55. Tabor also made slides of Q5 (jeans), Q6(1), and Q6(2) (underwear cuttings); each of these items are smears of the extract of the items. These were not tested.

56.     The fingernail clippings were not processed.

**D.     2003 Forensic Testing on Remand from the Florida Supreme Court in Postconviction**

57.     On March 21, 2003, the Florida Supreme Court remanded Mr. Duckett's postconviction proceedings to the circuit court for DNA testing indicating the trial court was to "determine whether clothing exists that can be tested for DNA . . . ." See (WR1. 450). Following submissions from the parties, this Court determined that certain items of evidence should be tested.

58.     FDLE examiner Emily Booth conducted some analysis on the submitted evidence, except slide Q6(3) and slides Q5, Q6(1) and Q6(2), and concluded that no DNA profile could be obtained from any of the evidence. Booth relied heavily on the previous analysis of the items done by Tabor in 1987, which was done at a time when DNA testing was not yet conceivable as a method for determining identity.

59.     As for slide Q6(3), examiner Booth testified that "due to the compromised nature of the slide, she was concerned that any attempt by her to unmount the slide would destroy the material on the slide and no DNA profile would be obtained." (WR1. 450). Pursuant to Examiner Booth's conclusions and the testimony of her supervisor regarding other

28

possible methods of testing the slide, Mr. Duckett investigated the potential for obtaining a DNA profile on slide Q6(3) from an outside agency. Each agency expressed the same concerns stated by Examiner Booth and confirmed that the questioned slide would be consumed entirely in the testing (WR1. 450-52). No further DNA analysis was attempted on slide Q6(3), and it was preserved at LCSO for the possibility of testing in the future when technology progressed.

60.    As for the remaining slides from 1987, Q5, Q6(1), and Q6(2), Booth testified that they slides were broken so she was unable to test the smears for biological material (PC-R1-SV. 2305-07).

61.    Examiner Booth also made cuttings of the underwear Q6; and she also took samples from the extracts Tabor made in 1987. According to Booth microscopic examinations of her samples from Q6(1) and Q6(2) showed no sperm. No other testing were done of the extracts. As for the underwear themselves, Q6, Examiner Booth indicated there were no chemical indications of semen, but it is unclear what, if any, analysis was conducted or if Booth relied solely on Tabor's assessment in 1987.

62.    Booth viewed liquid extracts from the jeans made by Tabor and saw no biological material on the slide (R. 2294). Booth did not

29

conduct her own extracts. Booth also indicated the jeans themselves, Q5, failed to indicate any sperm or blood, but again, it is unclear what analysis was performed. Booth did take another cutting from near where the original cutting was taken and indicated that testing for fluids was negative.

63.   Before the evidence made it back to FDLE for testing in 2003, the cutting of the jeans that indicated sperm curiously went missing (PC-R1-SV. 2298).

64.   According to Booth, the vaginal swabs identified as Q43 and Q43a, had no cotton remaining on the wooden sticks. She indicated that she reviewed the items under a microscope and did not see sperm; however, no chemical tests or further assessment was completed (PC-R1-SV. 2306-08). Booth indicated she assessed Tabor's extract of the swabs and saw no biological material on a slide. A smear was made of the vaginal swab, which is also identified as Q43. This item indicated the presence of cellular debris, possibly epithelial cells; however, no further analysis was conducted (PC-R1-SV. 2307).

65.   Fingernail scrapings from both of Ms. McAbee's hands were also collected in 1987. These were processed for the first time in 2003.

The fingernail scrapings are identified as Q30 and Q31. Booth testified that she opened the envelope holding the scrapings and poured the pieces into a chemical solution without looking at them under a microscope first (PC-R1-SV. 2310-12). She yielded no probative results.

**E.    Florida's Laws Set Forth Specific Procedures for DNA Testing in Capital Postconviction Cases and Access to Discovery.**

**i.    *Florida's Rule of Criminal Procedure 3.853: Motion for Postconviction DNA Testing***

66.    Rule 3.853 is the only mechanism for postconviction DNA testing in capital cases.

67.    Rule 3.853 and the pleading requirements are identical to § 925.11, Florida Statutes, which provides statutory authority for postconviction DNA testing, save for the use of the term movant instead of petitioner and defendant.

68.    The motion must be made under oath, and must be under oath and contain the following:

> (1) a statement of the facts relied on in support of the motion, including a description of the physical evidence containing DNA to be tested and, if known, the present location or last known location of the evidence and how it originally was obtained;
>
> (2) a statement that the evidence was not previously tested for DNA, or a statement that the

31

results of previous DNA testing were inconclusive and that subsequent scientific developments in DNA testing techniques likely would produce a definitive result establishing that the movant is not the person who committed the crime;

(3) a statement that the movant is innocent and how the DNA testing requested by the motion will exonerate the movant of the crime for which the movant was sentenced, or a statement how the DNA testing will mitigate the sentence received by the movant for that crime;

(4) a statement that identification of the movant is a genuinely disputed issue in the case and why it is an issue or an explanation of how the DNA evidence would either exonerate the defendant or mitigate the sentence that the movant received;

(5) motion; and

(6) a statement of any other facts relevant to the a certificate that a copy of the motion has been served on the prosecuting authority.

69. If a movant makes a facially sufficient motion, the court must order the State to respond.

70. Once the court reviews the State's response, it can rule on the merits of the motion or hold a hearing.

71. The circuit court is not required to grant testing, even if the movant meets the criteria of the rule. The court may grant testing, and if it does, it must make the following findings:

32

(A)　Whether it has been shown that physical evidence that may contain DNA still exists.

(B)　Whether the results of DNA testing of that physical evidence likely would be admissible at trial and whether there exists reliable proof to establish that the evidence containing the tested DNA is authentic and would be admissible at a future hearing.

(C)　Whether there is a reasonable probability that the movant would have been acquitted or would have received a lesser sentence if the DNA evidence had been admitted at trial.

72.　The rule provides that if the court grants testing, the cost may be assessed by the movant, unless the movant is indigent, then the State must bear the cost.

73.　As for the laboratory to conduct testing, Rule 3.853 requires:

court-ordered DNA testing must be ordered to be conducted by the Department of Law Enforcement or its designee, as provided by statute. However, the court, on a showing of good cause, may order testing by another laboratory or agency certified by the American Society of Crime Laboratory Directors/Laboratory Accreditation Board (ASCLD/LAB) or Forensic Quality Services, Inc. (FQS) if requested by a movant who can bear the cost of such testing.

74.　Subsection (8) of Rule 3.853 requires "results of the DNA testing ordered by the court must be provided in writing to the court, the movant, and the prosecuting authority."

33

75.   There are no time limits for requesting DNA testing included in the Rule itself, nor are there any prohibitions against filing successive motions for postconviction DNA testing.

76.   In 2023, the Florida Supreme Court applied its jurisprudence concerning procedural bars for raising substantive claims to Rule 3.853 motions and concluded that litigants are precluded from requesting testing of evidence in a successive motion that it knew about and could have included in an initial request for postconviction DNA testing. *Reynolds v. State*, 373 So. 3d 1124, 1126-27 (Fla. 2023).

### ii.      *Florida Statutes § 925.11: Postsentencing DNA Testing*

77.   Section 925.11 provides postconviction DNA testing for "a person who has been tried and found guilty of committing a felony, and has been sentenced. . ." and "a person who has entered a plea of guilty or nolo contendere to a felony before July 1, 2006 and has been sentenced . . . ." Fla Stat. § 925.11(1)(a)(1)-(2).

78.   As noted above, the pleading requirements and procedures of Rule 3.853 are based on § 925.11, and the two are nearly identical.

79.   The only substantive difference between rule 3.853 and the statute is that rule 3.853 permits an "on a showing of good cause," the

court to "order testing by another laboratory or agency" that is properly accredited "if requested by a movant who can bear the cost of such testing." Fla. R. Crim. P. 3.853 (c)(7)

### iii.    *Florida's Rule of Criminal Procedure 3.852: Capital Postconviction Public Records Production*

80.    In Florida, public records are governed by Florida Rule of Criminal Procedure 3.852. After the initial round of records are produced, additional demands for records must be made pursuant to Rule 3.852(i).

81.    Demands made pursuant to Rule 3.852(i) must include an affidavit from counsel attesting to the following:

> (A) [] that collateral counsel has made a timely and diligent search of the records repository; and
>
> (B) identifies with specificity those public records not at the records repository; and
>
> (C) establishes that the additional public records are either relevant to the subject matter of the postconviction proceeding or are reasonably calculated to lead to the discovery of admissible evidence; and
>
> (D) shall be served in accord with subdivision (c)(1) of this rule.

Fla. R. Crim. P. 3.852(i)(1).

82.    The court may order that the records be produced if the following criteria is met:

(A) collateral counsel has made a timely and diligent search of the records repository;

(B) collateral counsel's affidavit identifies with specificity those additional public records that are not at the records repository;

(C) the additional public records sought are either relevant to the subject matter of a proceeding under rule 3.851 or appear reasonably calculated to lead to the discovery of admissible evidence; and

(D) the additional records request is not overly broad or unduly burdensome.

Fla. R. Crim. P. 3.852(i)(2).

83.    Agencies are permitted to object and to assert statutory exemptions to the production of records; however, the State has a concomitant obligation to furnish records. *Ventura v. State*, 673 So. 2d 479 (Fla. 1996). The Florida Supreme Court has held that when the State's failure to disclose public records results in a capital postconviction litigant's inability to fully plead claims for relief, the State is estopped from claiming that the postconviction motion should be denied or dismissed. *Id.* at 481 ("The State cannot fail to furnish relevant information and then argue that the claim need not be heard on its merits because of an asserted procedural default that was caused by the State's failure to act.").

### *i. Standard for Evidentiary Hearing*

84.    The Florida Supreme Court has consistently held that "[a] circuit court should hold an evidentiary hearing on a rule 3.851 motion 'whenever the movant makes a facially sufficient claim that requires a factual determination." *Sparre v. State*, 391 So.3d 404, 405 (Fla. 2024) (quoting *Rogers v. State*, 327 So. 3d 784, 787 (Fla. 2021)); *see also Pardo v. State*, 108 So. 3d 558, 560 (Fla. 2012)).

85.    Summary denial is only proper where a movant's motion is "legally insufficient or procedurally barred, or if its allegations are conclusively refuted by the record." *Id.* at 405 (quoting *Morris v. State*, 317 So. 3d 1054, 1071 (Fla. 2021); *see also Matthews v. State*, 288 So. 3d 1050, 1060 (Fla. 2019).

## F.    Warrant Proceedings

86.    Promptly following the Governor's signing of Mr. Duckett's execution warrant on February 27, the Florida Supreme Court issued an order directing all litigation in the circuit court to be concluded by Friday, March 13, 2026 at 11:00 a.m. (WR1. 23). Mr. Duckett's petition for a writ of habeas corpus to the Florida Supreme Court was due the same day, and his initial brief on appeal was due March 16.

37

87.    On March 2, the circuit court then held an initial case management conference to address preliminary matters and set its own scheduling order (WR1. 44-50). Mr. Duckett was directed to request all public records by March 3 and held a hearing on the demands and agency objections on March 4. Mr. Duckett was directed to file his postconviction motion by Sunday, March 8 at 1:00 p.m. (WR1. 44-50).

> ***i.    The circuit court granted Mr. Duckett's motion for postconviction DNA testing, agreeing that identity is an issue and the results could be probative; however, it also "permitted the State to exercise complete control over the location, timing, and method of testing" (WR2. 27).***

88.    On March 5, Mr. Duckett moved for postconviction DNA testing of slide Q6(3) pursuant to Florida Rule of Criminal Procedure 3.853 (WR1. 433-543, 629-740). Mr. Duckett focused on the Q6(3) slide because DNA evidence of this nature from the victim's underwear left by the true perpetrator would conclusively exonerate him.

89.    Mr. Duckett obtained an affidavit from former FDLE analyst Booth who had conducted the testing in 2003. Booth's affidavit indicated that based upon her review of the case file and her recognition of the degradation of the biological materials, the method of testing most likely to obtain a valid profile on the slide was Single Nucleotide Polymorphism

("SNP") testing as opposed to Short Tandem Repeat ("STR") (WR1. 658-60).

90.    Mr. Duckett had been referred to Othram, Inc., a leading laboratory in forensic testing, both because it conducts SNP using Forensic-Grade Genome Sequencing ("FGGS"), a specialized optimized application of Whole Genome Sequencing ("WGS"), and because Othram conducts the exact testing for FDLE, which does not offer SNP at all. Mr. Duckett retained David Mittelman, Ph.D., Chief Executive Officer and cofounder of Othram to obtain an affidavit explaining that SNP testing "would provide the most reliable method of extraction of testable DNA from the Q slide" (WR1. 728-40). Mittelman noted that "the technology used at Othram is relatively new and thus is not available for use in most laboratories," and that Othram was capable of conducting the testing "within one to two weeks from receipt of the slide" (WR1. 536). Mr. Duckett simultaneously moved the court to grant a 30-day stay of execution to allow for the SNP testing to be conducted and for a full and fair evidentiary hearing once results were received (WR1. 544-50).

91.    Mr. Duckett filed his motion on March 5, just six days after his execution warrant was signed. The circuit court held an impromptu

hearing on the motion the next day, March 6 at noon. Due an error with counsel's email addresses, counsel had no knowledge that the circuit court had even set the DNA motion for a Zoom hearing. Counsel learned of the hearing as it was beginning, when the court's judicial assistant sent an email asking if counsel intended to join the hearing already in progress.

92.    Because Mr. Duckett's team had no notice and the hearing had already begun, they had no opportunity to prepare the expert, who they had just met a few days previously, before putting him on as an expert witness. During a short 15-minute recess, counsel was able to reach Dr. Mittelman and he agreed to appear via Zoom to answer the court's questions. This was the only time Mr. Duckett was able to present expert testimony.

93.    The State, however, had an FDLE analyst appear for the hearing. The State did not elicit any questions as to the requisite type of testing or the length of time required to conduct testing.

94.    At the hearing, the State indicated that it did not object to DNA testing on slide Q6(3) and agreed that the factual prerequisites set forth in Rule 3.853(c)(5)(A)-(C) had been met (WR1. 792-95). The State

did not dispute that the results of testing would be admissible.

95.    The hearing focused on how long testing would take and who would conduct the testing.

96.    Mr. Duckett maintained that due to the condition of the item, SNP testing was the appropriate method of testing instead of STR. While SNP testing could take slightly longer if the DNA is highly degraded, Dr. Mittelman assured the court that "we're talking about . . . weeks and not months." (WR1. 818).

97.    Because FDLE is not capable of conducting STR testing, Mr. Duckett suggested Othram. Othram is a leading lab in SNP analysis and Othram has a previous relationship with FDLE. Dr. Mittelman confirmed that Othram conducts testing for FDLE regularly and was available at any time to begin the testing, which would take from days to a few weeks (WR1. 815, 818). The State was adamant that any testing should be done by FDLE and that "there [had] been no showing that that . . . SNP DNA testing . . . is necessary." (WR1. 791). Dr. Mittelman explained that the decision as to whether SNP or STR testing would be appropriate is made at the quantification step after dismounting the slide (WR1. 813-14); and the State asserted that FDLE should be the one to

review the evidence, conduct the quantification step, and "make the determination whether SNP testing its necessary or appropriate." (WR1. 799).

98.   The court granted testing finding that the results of the DNA testing would likely be admissible at trial or a future hearing, "that identity was an issue at trial, and that if DNA testing of the sperm indicated that it did not belong to [Mr. Duckett], there would have been a reasonable probability of an acquittal" (WR1. 748).

99.   Although Rule 3.853 provides for an outside lab to conduct testing if good cause is shown, the court declined to exercise its discretion on the issue. Instead, the circuit court ruled that FDLE would conduct the quantification analysis, and if it was deemed SNP was appropriate, FDLE would send the sample to another lab as its designee (WR1. 806, 819-20).

100.   Although at the time the testing was granted and no one knew definitively when the testing would be complete, the court denied Mr. Duckett's motion for a stay of execution as "premature" (WR1. 742, 825-26, 828).

101.   Likewise, Mr. Duckett's postconviction claims under warrant

were due Sunday, March 8. Because Mr. Duckett intended to use the results in support of his motion alleging his actual innocence, Mr. Duckett requested the circuit court stay the warrant proceedings until the DNA testing concluded. The circuit court denied his motion.

102. Mr. Duckett timely filed his Successive Motion to Vacate Judgments of Convictions and Sentences with Special Request for Leave to Amend on Sunday, March 8, at 1:00 p.m. (WR1. 884-926). Claim I of Mr. Duckett's motion asserted that he is actually innocent and that his convictions and death sentence stand in violation of the Fifth, Sixth, Eight, and Fourteenth Amendments to the United States Constitutions and the corresponding provisions of the Florida Constitution. Because results of the DNA testing would likely provide conclusive new evidence of his innocence, Mr. Duckett provisionally asserted the issue and expressly sought leave to amend his motion once that evidence was received. Claim I also asserted that records produced for the first time under warrant showed the State had in fact withheld information that the FBI sought to reexamine Mr. Duckett's case based on FBI Agent Michael Malone's microscopic hair comparison analysis at trial. Because of the State's withholding of material information, Mr. Duckett was

43

forced to piecemeal his challenges to the false forensic testimony presented at his trial. In Claim II of his motion, Mr. Duckett asserted that the unreasonably truncated and surprise nature of Florida's warrant process has served to deprive him of his right to full, fair, and meaningful postconviction proceedings in violation of the Fifth, Eighth, and Fourteenth Amendments. As support, Mr. Duckett pointed inter alia to the fact that he was having to proceed with filing his 3.851 motion when its resolution unequivocally turns on the results of impending DNA testing permitted by the court. Mr. Duckett simultaneously renewed his motion for a stay of all proceedings until the DNA results are returned (WR1. 927-33).

103. On March 10, the circuit court held a *Huff* hearing on the motion and heard argument as to whether the claims warranted evidentiary development.[3]

---

[3] Rule 3.851 of Florida's Criminal Procedure and established case law requires the circuit court to hold a case management conference, also known as a *Huff* hearing (*Huff v. State*, 622 So. 3d 982 (Fla. 1993), wherein the court hears legal argument as to strictly legal claims and hears argument as to whether an evidentiary hearing should be ordered on the defendant's claims. Mr. Duckett uses the term "*Huff* hearing" to denote when argument is heard on the claims as opposed to case management conference which can refer to general hearings under warrant.

*ii.      FDLE's recommendation as to the type of testing required of the relevant evidence at issue.*

104.  At the *Huff* Hearing, the court also addressed the status of the DNA testing.

105.  LCSO had delivered the Q6(3) slide to the FDLE Crime Laboratory in Orlando the day prior, on Monday, March 9. FDLE also received buccal swabs from Mr. Duckett and Ms. McAbee's mother as reference samples for comparison.

106.  FDLE informed the court and parties that the quantification process was underway and that it expected to have results on Thursday morning, March 12 (WR1. 1058-59). The court ordered FDLE to promptly provide the parties with the quantification results and its recommendation for testing, and further ruled that Mr. Duckett would have three hours from the disclosure of the information for his experts to review the data and file any concerns regarding FDLE's testing choice with the court (WR1. 981-83). The court further ruled that if Mr. Duckett did not contest FDLE's recommendation within the three-hour window, FDLE could begin conducting STR testing, if that is the testing it deemed appropriate (WR1. 981).

107.  The court thereafter raised the issue of how to ensure FDLE

had sufficient time to complete the DNA testing and heard argument from the parties on whether a stay of execution or an extension from this Court was needed (WR1. 1029-32). While Mr. Duckett maintained that a stay was the appropriate course of action, the State argued the opposite, suggesting that "the Court could reasonably under the circumstances ask [this Court] to extend the Court's time for entering a final order certainly for seven days and I think that would give us enough time to have the DNA results back and do what we need to do . . . ." (WR1. 1032-33).

108. Less than three hours after the *Huff* hearing ended, the court issued an order denying an evidentiary hearing on Mr. Duckett's claims (WR1. 977-80).

109. The circuit court simultaneously moved the Florida Supreme Court for a seven-day extension of time to enter its final order on Mr. Duckett's warrant proceedings, noting that "[w]hichever test is performed, the results should be done no later than March 18, 2026." (WR1. 973) (emphasis added). Acknowledging that "potential genetic material had been identified in this case, which would likely be admissible and would have a reasonable probability of producing an acquittal at trial if favorable to Defendant," the court specifically

requested the time "to receive the results of the DNA testing under Fla. R. Crim. Pro. 3.853(c)(8) so as to fully adjudicate the matter." (WR1. 972-73). At the time of the circuit court's motion for additional time, the Florida Supreme Court's scheduling order required all of Mr. Duckett's circuit court proceedings conclude 3 days later.

110. The Florida Supreme Court granted the extension, in part, on March 11, and ordered the circuit court "to file a status report . . . no later than 5:00 p.m., Wednesday, March 18, 2026, or within 12 hours of receiving DNA results, whichever occurs first." (WR1. 1074).

111. The FDLE Crime Laboratory in Orlando completed the quantification earlier than expected and the Assistant State Attorney notified undersigned counsel via email at the end of the day on March 11. However, neither the State nor FDLE would disclose to Mr. Duckett what FDLE's results revealed. The email did not state whether FDLE believed the results were sufficient for STR testing, or whether FDLE would be submitting the results to another agency for SNP testing. Counsel responded to the Assistant State Attorney and requested the information. He responded indicating he had "no further information to pass along at this point." Counsel then sent a similar email to the

Assistant Attorney General, who also responded that she had no additional information. She further indicated she was not in contact with the FDLE. Counsel then contacted the FDLE analyst directly requesting the information regarding what method of testing the FDLE believed was warranted given the quantification results. FDLE did not respond. Mr. Duckett's three-hour window to analyze FDLE's recommendation for testing was set to begin at 8 a.m. on March 12. Mr. Duckett's counsel again contacted FDLE that morning and heard nothing in return.

112. At 9:06 a.m. the court set a hearing for 11:00 a.m. the same morning to address the outstanding question as to which testing FDLE recommended (WR1. 1076). Because counsel had yet to receive the information from any parties, counsel filed a renewed motion for stay, detailing the events of the prior 19 hours, and requesting that the court preclude FDLE from moving forward without having disclosed its recommendation as required and giving Mr. Duckett an opportunity to examine it (WR1. 1080-87).

113. At the 11:00 a.m. hearing, the court expressed frustration because FDLE had failed to disclose its recommendation, thereby delaying the proceedings. FDLE then announced that it agreed with the

48

defense that the "best course of action" was to process the DNA using SNP (WR1. 1116).

### iii.    The circuit court directed FDLE to pick the outside lab to conduct the SNP testing.

114.  FDLE's results were significant and instructive. Until FDLE successfully retrieved the biological evidence from the Q slide, the existence of usable DNA evidence was uncertain and largely speculative. Mr. Duckett argued below that because the amount of DNA recovered appeared to be very limited, careful coordination was required to determine the best testing strategy. He emphasized that testing decisions must be made carefully to avoid consuming the sample in a way that prevents the most informative analysis.

115.  Deputy Director of Forensic Services Leigh Clark confirmed that FDLE was unable to do the testing and listed four accredited labs that do: Othram, DNA Labs International ("DLI"), Bode Laboratories ("Bode"), and Signature Science. Although FDLE expressly stated, "We presently have our SNP testing needs met by Othram in Texas," for the first time, FDLE informed the court that it was not in a position to contract with any lab as its designee in this case (WR1. 1115). FDLE explained that the parties would be the client.

116. FDLE's statement proved to be false. When the circuit court later ordered the sample be sent to DLI, FDLE completed the contract and listed itself as the initiating agency. FDLE was also the main point of contact. Despite the circuit court ordering CCRC-South to pay for the testing, DLI would not even update counsel as to the testing progress (*See* WR2-S2. 342). Indeed, the lab told undersigned counsel that all communications and information regarding the testing were required to go through FDLE per the AG.

117. The court asked Ms. Clark to give a recommendation as to the lab to conduct the testing. Ms. Clark provided an analogy to make the point again that she was not an expert in SNP testing (WR1. 1128). Notwithstanding this answer, the court maintained that its order stood and FDLE was to perform the testing or figure out a lab (WR1. 1115). Despite previously agreeing FDLE could designate another lab to perform SNP testing as it's designee, the State suddenly objected to any other lab conducting the testing and to the evidence leaving the state (WR1. 1121).

118. After revisiting Rule 3.853, the court determined good cause existed for a private lab to conduct the testing—a fact that Mr. Duckett

had argued a week earlier. The court then directed FDLE to inquire of each lab "their technical capabilities, capacity to perform the testing, the location of the lab that will perform the testing, and their anticipated timeline to complete such testing." (WR1. 1092). Before FDLE returned the results of its inquiry, the court entered an order that night directing FDLE to select a lab.

119. FDLE contacted each lab, except Othram, and sent the information to all parties the same evening but did not, however, select a lab. At 9:06 p.m. the court set a hearing for 9:00 a.m. the following morning. FDLE's research indicated that Othram was the best choice—the lab offered the fastest turnaround time, the most advanced technology, and greater capability for analysis of the results on the back end of the testing. Indeed, Othram was the only lab that could do both the testing and conduct the requisite analysis.

120. On March 13, Ms. Clark again appeared and reported only *some* of the information gathered from the labs. Because the court only scheduled the hearing the night before, Dr. Mittelman was unable to appear due to a previously scheduled appointment. Mr. Duckett was unable to offer testimony from a scientist experienced in the testing at

hand and rebut any misinformation. Instead, the court relied on Ms. Clark's representations regarding SNP despite her testimony that she is not trained on nor does she conduct SNP testing.

121.   Mr. Duckett requested SNP testing be conducted using WGS, which is specifically designed for degraded samples. At the March 12 hearing, Ms. Clark agreed "that it would be best for the private lab that would be conducting SNP testing to have the capabilities for a whole genome sequencing. . . ." because "you would want a professional who performs whole genome sequencing to make that decision [on whether WGS was necessary] based on the quantitation [sic] data" (WR1. 1135, 1130-31) (emphasis added). Ms. Clark told the court that FDLE was "not in a position to be able to make a recommendation as to whole genome sequencing or not." (WR1. 1131). Ms. Clark clarified that the only recommendation FDLE could make was that SNP technology should be used (WR1. 1131).

122.   Although Dr. Mittelman testified at the March 6 hearing that WGS would take only 1-2 weeks, and that he could start immediately, Ms. Clark testified that WGS would take 6-8 weeks (WR1. 733, 1158). Upon learning that DLI and Signature Science offered a different kit,

ForenSeq Kintelligence, which would only take 15 days, Ms. Clark changed her testimony: "in my opinion the whole genome sequencing is not necessary, and I do not believe that type of testing would be performed by Othram or DNA labs in this example" (WR1. 1158). Ms. Clark testified the day prior that the question about length of time "would be better posed to the entity that's actually going to perform the testing," (WR1. 1133-34), yet the only accredited lab certified to do SNP testing who provided an estimate on WGS testing was Othram, and that time limit was significantly shorter than the 6-8 weeks asserted by Ms. Clark. The statement was patently wrong as Dr. Mittelman indicated Othram would conduct WGS. Having no experience herself, Ms. Clark opined that whole genome sequencing is "overkill" (WR1. 1159). Instead of following the dictates of the science, the determination of who was to do the testing and the method of testing performed was primarily driven by the perceived time limits which were not supported by the record and by the State's demands.

123.  It was never determined whether DLI found this to be the best option based on their analysis or if they simply did the testing they were

told to by FDLE.[4] Indeed, it was never determined whether Kintelligence is approved for mixed samples containing male DNA. What was established, however, is that Kintelligence is meant for other types of DNA analysis and is not used for scientific questions like the one in Mr. Duckett's case (WR1. 1161). That means that DLI does not have the capability to conduct the analysis of the data required in this case— a point Ms. Clark mentioned in her email to the parties but conveniently left out of her summary to the court (See WR2. 156) ("DLI does not perform statistical analysis of Y-SNP results and therefore cannot provide a probability determination of data obtained in testing.").

124.   The circuit court issued an order, relying on the unsupported assertions FDLE made to the court. The order explained that Ms. Clark opined that WGS is not necessary and that the Kintelligence kit is "capable of providing a DNA profile for comparison to a known sample" and "would yield results in approximately fifteen days" (WR1. 1144). The court directed DLI to conduct the testing and use Kintelligence, "or any other such testing methods. . . ." (WR1. 1144).

---

[4] DLI's initial response envisioned a test that would take closer to a month and would be conducted in their Utah facility (WR1. 1233-35).

125.   Thereafter, the slide was transported to DLI.

***iv.***     ***The circuit court's refusal to stay proceedings despite Mr. Duckett's inability to access the discovery, in the form of DNA testing results, the court ordered.***

126.   On March 13, the parties learned that the testing would likely be completed on or before March 27. The Florida Supreme Court had granted the circuit court an extension to address the DNA results and the circuit court had the authority to issue a stay. Yet, at the behest of the State, on March 17, the circuit court ruled on Mr. Duckett's warrant proceedings and denied all claims, including his claim of actual innocence which was reliant on the outstanding results of the DNA testing.

127. Mr. Duckett appealed to the Florida Supreme Court and promptly moved for a stay, which the court granted (WR2. 27). The court, however, did not rule on Mr. Duckett's motion to stay until after briefing was submitted. This is notable, because as Mr. Duckett will explain below, significant litigation occurred thereafter and the court refused to allow Mr. Duckett to supplement his briefing before the court ruled on his appeal.

> ### v.     *DLI's testing required additional analysis, yet the circuit court refused to permit Mr. Duckett to have a bioinformaticist read the data, as recommended by FDLE.*

128.  Following the delivery of the Q slide to DLI, DLI refused to communicate with Mr. Duckett's counsel regarding any aspect of the DNA analysis.

129.  Before the DNA testing results were returned, Mr. Duckett had filed a Motion Requesting Testing Protocol, Data, and Results of DNA Testing (WR2. 1-13). He explained that these items are necessary to assess the testing conducted and ascertain additional information. The State responded, arguing that Mr. Duckett is entitled to only the results and no other underlying data or protocols (WR2. 14-26). As expected, the State objected to Mr. Duckett's access to the records.

130.  On March 27, 2026, undersigned counsel received the results of the DNA testing conducted by DLI via email from Ms. Clark. The results were reported as inconclusive and DLI was unable to obtain a profile. The testing *did* yield data. The issue, however, is that DLI does not have the capability to conduct the requisite analysis to determine if a profile can be obtained—a problem FDLE was aware of when submitting the sample to DLI (WR2-S2. 308). Ms. Clark expressly stated

that the analysis is not yet over. While FDLE is unable to provide an opinion on the results of the tests, Ms. Clark suggested that "[a] qualified bioinformaticist may be able [sic] provide an opinion and calculation based on the Y SNP results." (WR2-S2. 308). Ms. Clark suggested that either Othram or Parabon Nanolabs, Inc., would be capable of further reviewing the Y SNP data—the same two labs Ms. Clark suggested initially when the circuit court was gathering information about which lab should conduct the testing in this case. *Id.*; (WR1. 1165-66, 1169).

131. The State surprisingly moved to lift the stay and conclude Mr. Duckett's Rule 3.853 proceedings immediately after filing the results with this Court, tersely asserting that "[t]he SNP DNA results were inconclusive" and that the stay should be lifted "[b]ecause the SNP DNA testing is complete and the results do not exonerate [Mr.] Duckett." Mot. to Lift Stay, Mar. 27, 2026.

132. Mr. Duckett requested time to litigate outstanding issues in his Rule 3.853 proceeding given that the testing was inconclusive and FDLE's indication that further analysis could still yield a profile that could exonerate him. Resp. to State's Mot. to Lift Stay, Mar. 27, 2026.

133. The Florida Supreme Court rejected the State's arguments

57

and ruled that the circuit court retained "concurrent jurisdiction to rule on motions related to DNA testing and successive claims filed by the petitioner . . . ." (WR2. 51). The Court directed the circuit court to file a Status Report on all pending issues by Thursday, April 2, 2026, at 5:00 p.m. *Id.*

134. Once the Court ruled that Mr. Duckett was permitted to litigate his outstanding Rule 3.853 issues, Mr. Duckett filed public records demands to the State Attorney's Office ("SAO-5"), FDLE, and the Attorney General's Office ("AG") requesting communication between each agency and DLI. As Mr. Duckett explained above, DLI would not communicate with CCRC-South, but did communicate with the State.

135. From FDLE, Mr. Duckett also requested the DLI case file and additional materials required for an expert to conduct a thorough assessment and analysis of the testing completed in order to render any further opinion (See WR2-S2. 345). The items were as follows:

> a. A legible copy of the entire case file and all associated notes, data, and records from DNA Labs International related to the investigation of James Aren Duckett and the homicide of Teresa McAbee (Client Case # 20030504421; DLI Case # 26-1337), including but not limited to all electronic SNP testing data files and marker data generated for each sample tested using ForenSeq Kintelligence.

b. DNA Labs International's testing procedures and protocols for Single Nucleotide Polymorphism (SNP) testing and use of ForenSeq Kintelligence, including:

   i. DNA Labs International's policies regarding handling of data with respect to SNP testing;

   ii. DNA Lab's International's relevant standard operating procedures (SOPs) and protocols in use at the time of SNP testing in this case;

   iii. DNA Lab's International's summaries of validation studies for SNP testing in use at the time of testing conducted in this case;

   iv. DNA Labs International's evaluation of measurement uncertainty in use at the time of testing conducted in this case; and

   v. DNA Labs International's procedures for managing, investigating, and reporting errors in SNP testing.

c. The likelihood rations (statistical interpretations) and thresholds used by DNA Labs International in the SNP testing on the Q6(3) slide in this case.

d. All proficiency tests for DNA Labs International regarding SNP testing and ForenSeq Kintelligence; all audit documentation of internal and external audits; and the curricula vitae of all individuals involved in the testing conducted in this case.

e. Communications, including emails, text messages, faxes, letters, as well as memoranda or notes documenting such communications, including phone calls, between any employee of the Florida Department of Enforcement and DNA Labs International; the Office of the Attorney General; and/or the Office of the State Attorney, Fifth Judicial Circuit, regarding DNA testing in this case from

March 5, 2026, to present.

f. Materials, documents, and/or information received by FDLE from DNA Labs International; the Office of the Attorney General; and/or the Office of the State Attorney, Fifth Judicial Circuit, regarding DNA testing in this case from March 5, 2026, to present.

136. While the circuit court had five days to assess next steps and file a status report with the Florida Supreme Court, the circuit court again moved as quick as possible through the proceedings. On March 31, the circuit court scheduled a same-day status hearing at noon and a subsequent hearing for the next morning, April 1, at 9:00 a.m.

137. At the March 31 hearing, Ms. Clark from FDLE and Rachel Oefelein, Ph.D., from DLI were present. This hearing, like every previous hearing, was not noticed as an evidentiary hearing and did not provide the defense with sufficient time or notice to secure expert attendance. Also, as with every previous hearing, the defense did not learn until the hearing if the State was bringing a witness or who that witness would be. Although both Ms. Clark and Dr. Oefelein were questioned by the court, neither were sworn as witnesses. Both confirmed that further statistical analysis of the Y SNP data from DLI is possible. Dr. Oefelein advised that the lab conducting the analysis recommended by the FDLE

would be conducting a quantitative analysis, not further testing of the biological evidence itself, and that the review should not require a lengthy amount of time. Ms. Clark verified the information relayed by Dr. Oefelein, and that this was the suggested course of action in her March 27 email to try and ascertain more definitive results. The court inquired of both as to whether the sample had been consumed, which both confirmed was true (WR2. 195-96).

138. Mr. Duckett requested the court hold an evidentiary hearing and hear from the scientists and subsequently permit another lab to analyze the testing data and determine whether conclusive results could be obtained (WR2. 189). When defense counsel requested that a representative from DLI appear at an earlier hearing to answer questions, they did not attend and the defense were informed by the court that even if they had attended, counsel would be precluded from asking them questions (WR1. 1202). At the hearing, Mr. Duckett again requested that the court send the data to Othram, the only lab suggested that was accredited to do the testing and was capable of reading the data. The State argued that the inconclusive result ended the inquiry (WR2. 188).

139. The State again made an unfounded and absurd claim that the Defense deliberately created a conflict with Othram labs (WR2. 193). Mr. Duckett explained at every turn in his warrant proceedings, there is no conflict. Mr. Duckett picked the lab because of its ongoing relationship with FDLE. Indeed, after it was known that Mr. Duckett retained Othram, the circuit court ruled that FDLE was permitted to choose "Othram as its designee" (WR1. 749). Despite the absurdity of this argument, at the March 31 hearing the court agreed with the State's argument and removed Othram as a potential lab to do the requested analysis of DLI's data, despite the fact that they were the most qualified agency for the job (WR2. 207-08).

140. The circuit court permitted the parties to file responses to arguments made at the hearing. Mr. Duckett was given until 3:00 p.m. and the State was given until 4:00 p.m. In his pleading, Mr. Duckett asserted that the Florida Supreme Court could have agreed with the State's argument that the results were inconclusive and no further analysis was warranted and could have lifted the Stay precluding any further review of the DNA results. The court did not do that. Mr. Duckett further urged the circuit court to hold an evidentiary hearing, as required

by *Cardona v. State*, 109 So. 3d 241, 247-48 (Fla. 4th DCA 2013), to hear from the scientists on the anticipated scope and procedure of any further analysis. This did not happen in the hearings determining who should do the testing and what testing should be done. Mr. Duckett explained that he wants nothing more than to have the evidence properly examined using the testing methods and analysis most likely to produce a testable profile (See WR2. 127). The State's pleading, arguing that an inconclusive result was the end of the necessary inquiry, highlighted the very need for an evidentiary hearing as it focused on scientific information not in evidence and in dispute.

141. The circuit court issued its order at 7:52 p.m. the same evening, in which it indicated it would determine whether Mr. Duckett is "entitled to the data from the DNA testing for its own independent analysis" at the hearing the next morning (WR2. 156-57). The court also further noted that it would address Mr. Duckett's "remaining discovery requests" (WR2. 157).

142. At the April 1 hearing, Mr. Duckett's counsel urged the court to hold an evidentiary hearing wherein the experts would provide testimony as to the outstanding factual issues. Mr. Duckett highlighted

63

the various facts at issue in this case and the necessity of a hearing to address them. He further requested, as he had in each of his pleadings and at prior hearings, that he seeks from the State records and data to provide the court with valid facts and evidence upon which it can rely.

143. The State boldly asserted, for the first time, and without a scintilla of evidence, that no further analysis was required because "we already know these are inculpatory not exonerating" (WR2-S. 239) ("[T]hese numbers don't exclude Duckett."); ("[E]ither one of those numbers incorporate it. They are both evidence of guilt."); (WR2. 271) ("He does not have any new evidence of his innocence. The only thing on the table is evidence including him."). It is unclear what number the State is referencing because there is no report, and thus no number reported. Counsel was baffled, noting that she felt a "little bit like we've entered - - we're Alice in – in Wonderland . . ." (WR2. 271). One can only describe the world in which the State can make such absurd and unfounded statements in litigation which will determine whether he lives or dies as a Wonderland.

144. The circuit court did not hold a hearing and no experts provided any sworn testimony concerning SNP data calculations. The

only information provided to the court was that the data needs to be read by a bioinformaticist.

145. The circuit court entered a written order denying Mr. Duckett's request to have the inconclusive data read by a qualified expert and his records demands. Mr. Duckett appealed and on April 30, 2026, the Florida Supreme Court reversed and remanded "for the underlying testing data to be provided for a statistical analysis, as directed by the Florida Department of Law Enforcement (FDLE)." *Duckett v. State*, 431 So. at 992.

146. Mr. Duckett had Othram review the data. The State also had the data analyzed by Parabon Nanolabs. The labs disagreed on the ability to determine an outcome. Parabon, albeit with caution, reported a likelihood ratio that supports Mr. Duckett having contributed to the evidentiary sample (WR1-S2. 2330). But as outlined in Othram's analysis, there are significant concerns regarding the validity of these findings, and insufficient information was provided with the report to determine the scientific validity of the evaluation (WR1-S2. 2342). One area of concern is that Parabon reported that due to the low and uneven coverage in the sample, they were only able to identify 27 loci—out of a

potential 10,230 SNP markers that this particular kit identifies and out of millions of SNP markers that each individual has - that provided significant data to allow them to be analyzed. Parabon's report stated that of the 27 loci, 25 were consistent with Mr. Duckett and 2 were "not observed in the suspect profile." (WR1-S2 2333). The report then states that the 2 loci may "*reflect contributions from an unknown individual*", or be stochastic effects of artifact (*Id.*)(emphasis added). The State has never asserted nor is there any evidence that there could be two separate contributors to the sample so if in fact the loci reflect contributions from an unknown individual, this excludes Mr. Duckett.

147. Othram also addressed issues with the Kintelligence Kit for analyzing the biological material in this case, noting that it was not developed as a probabilistic genotyping platform for highly degraded, low-template DNA mixtures (WR1-S2. 2347). Mr. Duckett moved for an evidentiary hearing on the DNA results, which was denied (WR1-S1. 2197, 2262). This Court dismissed Mr. Duckett's 3.853 appeal for lack of jurisdiction, finding that Mr. Duckett's "request for an evidentiary hearing [was] not authorized, and the . . . order denying that request [was] not appealable." *Duckett v. State*, SC2026-0959, 2026 WL 1895689,

at *1 (Fla. July 1, 2026).

148. Mr. Duckett immediately moved to relinquish jurisdiction to file additional claims and for supplemental briefing to address the impact of the 3.853 litigation on his proceedings that had been stayed since March 26 by this Court. Notwithstanding these motions, the Florida Supreme Court disposed of Mr. Duckett's pending 3.851 appeal and habeas petition and vacated the stay of execution. *Duckett v. State*, SC2026-0449 & SC2026-0450, 2026 WL 1970442, at *1 (Fla. July 8, 2026). The court specifically found Mr. Duckett's actual innocence claim meritless because he did "not have a viable newly discovered evidence claim based on the DNA testing results" from the Q slide, which were inconclusive. *Id.* at *4. The court further denied Mr. Duckett's motions to supplement briefing and relinquish.

149. With no execution date, Mr. Duckett filed a successive 3.851 motion for postconviction relief the next day asserting that the State's destruction of the Q6(3) slide violated his rights to due process as defined by *California v. Trombetta,* 467 U.S. 479 (1984), and *Arizona v. Youngblood,* 488 U.S. 51 (1988), and its progeny (WR3.1). Because identity remains at issue, Mr. Duckett also filed a second motion for DNA

testing pursuant to Rule 3.853, requesting the court grant SNP testing of additional intimate evidence collected as part of the criminal investigation (WR3. 36).

150.  On July 14, the Governor reset Mr. Duckett's execution for July 28, 2026, at 12:00 p.m. The State filed responses to Mr. Duckett's 3.851 and 3.853 motions July 15 (WR3. 89, 112). The lower court entered a written order summarily denying both motions on July 17.

151.  The court deemed the 3.853 motion procedurally barred because the items he sought to have tested could have been included when he initially sought DNA testing after his warrant was signed and further found that Mr. Duckett's motion did not comport with the requirements of Rule 3.853(b) because "he . . . failed to include a description of physical evidence containing DNA or that the previous results were inconclusive." (WR3. 220).

> vi.  ***The Florida Supreme Court's Rulings Following the Circuit Court's Denial of Further Review and Litigation of Mr. Duckett's Rule 3.853 Motion***

152.  Following the lower court's denial of Mr. Duckett's request to hold an evidentiary hearing and allow the parties to present the experts that reviewed the DLI data, Mr. Duckett appealed.

68

153. Although the Rules of Appellate Procedure provide for appellate review by the Florida Supreme Court of the disposal of Rule 3.853 proceedings, the state court dismissed Mr. Duckett's appeal. The court improperly characterized Mr. Duckett's appeal as a review from a non final, non appealable order.

154. The state had argued throughout Mr. Duckett's litigation that he was entitled to file a new postconviction claim following the results of the DNA testing. When he sought an evidentiary hearing on the Rule 3.853 motion, requesting an opportunity for the experts to provide testimony as to their testing, the state again argued that he should have filed a new postconviction claim.

155. Mr. Duckett moved the Florida Supreme Court to relinquish jurisdiction on the Rule 3.851 postconviction motion so that he could file additional challenges, in light of the results of the DNA testing. He likewise filed a motion to supplement his briefing pending before the court because more than 3 months of contentious litigation had occurred since he filed his briefing. In one fell swoop, the Florida Supreme Court denied his requests, lifted the stay of his warrant proceedings and issued an opinion denying the appeal of his Rule 3.851 claims in which he raised

actual innocence as a bar to his execution.

156. The following day, on July 9, 2026, Mr. Duckett filed a successive postconviction motion asserting that the State knowingly selected a destructive testing methodology that was unsuitable, and unable to produce a definitive forensic information, in violation of the rule, when a superior and equally available alternative existed, thereby permanently eliminating any opportunity for independent testing of the best evidence to exonerate Mr. Duckett.

157. Mr. Duckett also filed a Rule 3.853 motion requesting DNA testing of additional items now that the State had destroyed the best evidence in the case. The court summarily denied Mr. Duckett's claim as meritless.

158. Although the circuit court previously determined that identity is at issue in this case and probative results excluding Mr. Duckett would be exonerative, the court summarily denied the claim as procedurally barred, determining that Mr. Duckett should have included the additional items in his initial request on March 5. The court further determined that the record conclusively established that no biological material existed on the remaining items, despite record evidence to the

contrary.

159. The Florida Supreme Court consolidated Mr. Duckett's appeal of both issues into one, which remains pending as of the filing of this complaint.

## CLAIMS

160. Mr. Duckett re-alleges and incorporates herein by reference the allegations contained in paragraphs 1 – 159 above.

## I.    First Claim for Relief: Denial of Due Process

161. The Fifth and Fourteenth Amendments to the U.S. Constitution guarantee the right to due process. *See* U.S. Const. amends. V, XIV.

162. Mr. Duckett has a liberty interest in utilizing state procedures to demonstrate his innocence and/or seek a reduction of his sentence. *See, e.g.*, *Gutierrez v. Saenz*, 606 U.S. 305, 314 (2025).

163. The State of Florida has created a statutory procedure through which persons convicted of a felony or who have entered a plea of guilty or nolo contender can obtain postconviction DNA testing and then utilize exculpatory results from that testing to secure postconviction relief. Fla. Stat. § 925.11.

164. Florida Rule of Criminal Procedure 3.853 offers a process specific to capital defendants in postconviction proceedings, wherein defendants can obtain postconviction DNA testing and then utilize exculpatory results from that testing to secure postconviction relief in the form of a new trial or a new penalty phase proceeding.

165. These processes, established by the State, for obtaining access to DNA testing must comport with fundamental fairness and due process. *See Dist. Attorney's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 69 (2009); *see also Skinner*, 562 U.S. at 530 (permitting a due process claim under 42 U.S.C. § 1983 where a state official refuses to release biological evidence for testing, thereby depriving a prisoner of "his liberty interests in utilizing state procedures to obtain reversal of his conviction and/or to obtain a pardon or reduction of his sentence"); *see also Gutierrez*, 606 U.S. at 314.

166. Florida's application of the postconviction relief procedure for DNA analysis "is fundamentally inadequate to vindicate the substantive rights provided." *Osborne*, 557 U.S. at 69.

167. Rule 3.853 provides the court complete discretion in whether to grant DNA testing even after a movant establishes "that physical

evidence that may contain DNA still exists," that the results "would likely be admissible at trial," and that "there is a reasonable probability that the movant would have been acquitted or would have received a lesser sentence if the DNA evidence had been admitted at trial." Fla. R. Crim. P. 3.853.

168. Rule 3.853 does not have a statute of limitations. Capital litigants are permitted to request postconviction DNA testing at any time. However, the courts have imposed an arbitrary and indefensible time restriction to Rule 3.853 motions. *See Reynolds v. State*, 192 So. 3d 41 (Fla. 2015) (determining petitioner was aware of the evidence he sought to test in his successive Rule 3.853 motion when he filed his initial Rule 3.853 motion; therefore he was procedurally barred.)

169. The Rule likewise does not provide a mechanism for capital defendants to access any information regarding the testing, including records and contact with the lab itself. There is no provision for access to records or entitlement to contact the lab. Instead, litigants are required to use Rule 3.852 to request records. However, because Rule 3.853 does not address the issue directly, the courts interpret 3.853 as not requiring access, thus defendants are outright denied the ability to know anything

about the testing, its progress and decisions made, or have any input as decisions impacting costs, which the defendant will bear if an outside lab conducts the testing.

170. The State's interpretation and application of Rule 3.853 governing postconviction DNA testing in capital postconviction cases is unconstitutional because it violates fundamental fairness and impermissibly deprives Mr. Duckett of access to DNA analysis by permitting the court to deny testing even when the requirements of Rule 3.853 are met, it precludes the parties from speaking to the analyst who conducted the testing, it precludes access to necessary records including laboratory protocols, and it implores a time limitation not contemplated by the rule, thereby placing an indefensible time restriction on new evidence.

> A.   *When the state court puts in place mechanism to analyze DNA but precludes parties from speaking to the analyst who conducted the testing about their qualifications, the testing conducted, and the protocols used in the laboratories, a due process violation is created.*

171. Following Mr. Duckett's filing of his initial motion for postconviction DNA testing, the circuit court ordered that FDLE coordinate with DLI to conduct the DNA testing of the Q6(3) slide.

74

Case 5:26-cv-00524   Document 1   Filed 07/22/26   Page 75 of 91 PageID 75

172. Despite testimony from the agency that it was unable to enter into a contract with an outside lab and become the client, FDLE contracted with DLI in Mr. Duckett's case. On the contract, FDLE listed itself and the Assistant Attorney General as the persons of contact. FDLE listed CCRC-South, counsel for Mr. Duckett in the billing information.

173. Rule 3.853(c)(7) indicates that FDLE is to conduct the postconviction DNA testing, or its designee, unless good cause is established that another lab should conduct the testing. The court interpreted 3.853(c)(7) as if FDLE was in charge of the testing at the behest of the State. As a result, the court made determinations that permitted the State (both the Office of the State Attorney and the Office of the Attorney General) to exercise complete control over the entire process depriving Mr. Duckett of due process.

174. Undersigned counsel contacted FDLE's Leigh Clark via email, which included the Office of the Attorney General and the Office of the State Attorney, and requested that CCRC-South be listed as a co-party to the contract and as a contract person, that was not done. Undersigned counsel then contacted DLI directly and requested updates about the testing. Counsel was told by DLI that the Office of the Attorney General

instructed DLI to direct all questions and communication from defense counsel to the State, due to confidentiality purposes.

175. The court's actions created an improper relationship between the outside lab and the State, completing cutting Mr. Duckett out of the testing process and precluding him from accessing critical information about the testing of the best evidence in his case.

176. Mr. Duckett was required to pay for the testing, without any parameters, even though the lab refused to speak with him. And because DLI conducted the testing it was told to by FDLE, without first assessing the sample and determining the appropriate approach, and at a rushed pace, DLI charged an additional expedited fee that was never communicated to the court or to Mr. Duckett before the court ordered DLI do the testing. Likewise, DLI conducted additional analysis simultaneous to the SNP of the slide that would normally have been completed afterward. This is important because, the additional analysis is not necessary of the initial analysis of the slide fails. Here, it was conducted even though it was not yet known whether the testing was necessary and Mr. Duckett's counsel, a state agency, was required to pay for it.

177. Rule 3.853 is silent as to a movant's access to records to any

communications between the State and the lab conducting the testing. Defendants argued in state court that its communication with DLI is work product. Rule 3.853 likewise does not address a movant's access to records concerning the testing such as the testing case file, laboratory protocols, proficiency tests of the laboratory, validation studies, operating procedures, statistical interpretations and thresholds. In Florida, public records in capital postconviction cases are requested through Florida Rule of Criminal Procedure 3.852.

178. Mr. Duckett filed demands for the records noted above, explaining the relevance of each item. The lower court denied Mr. Duckett's demands finding they were "neither 'relevant to a subject matter of a proceeding under rule 3.851' nor 'reasonably calculated to lead to the discovery of admissible evidence' as required by Fla. R. Crim. Pro. 3.852" (WR2. 163). On appeal, the Florida Supreme Court affirmed.

179. The court's denial of access to these records is both belied by the record and violated due process and equal protection guaranteed by the Fifth and Fourteenth Amendments to the U.S. Constitution and the corresponding Florida Constitution provisions.

180. Rule 3.852 "was never intended to, and, indeed, [can]not,

77

diminish a citizen's constitutional right to access to public records." *In re Amends. to Fla. R. Crim. P. Cap. Postconviction Recs. Prod.*, 683 So. 2d 475, 477 (Fla. 1996) (Anstead, J., specially concurring); *Sims*, 753 So. 3d at 71-72 (Anstead, J., concurring). Rather, it was designed "to promote the prompt and efficient processing of capital cases in a fair, just, and constitutionally sound manner." *In re Amends. to Fla. R. Crim. P. 3.851, 3.852, et. seq.*, 797 So. 2d 1213, 1216 (Fla. 2001). "[A]ccess to public records [remains] an essential ingredient in any meaningful postconviction review," *Sims*, 753 So. 3d at 71 n.10 (Anstead, J., concurring), and in safeguarding a death-sentenced individual's due process rights under both the federal and state constitutions. *See Evitts*, 469 U.S. at 401. "[E]xecution is the most irremediable and unfathomable of penalties," *Ford v. Wainwright*, 477 U.S. 399, 411 (1986), and the need for absolute transparency is at its apex when the State "tinker[s] with the machinery of death." *Callins v. Collins*, 510 U.S. 1141, 1130 (1994) (Blackmun, J., dissenting).

181.   The State of Florida cannot develop a procedure for a litigant and then preclude the litigant to inquire as to all matters concerning that procedure. The level of unilateral authority in this case cloaked the

process in a layer of secrecy that undermines the integrity of the 3.853 proceedings.

    B.    *When the state court puts in place mechanism to analyze DNA and summarily denies a motion to test the evidence even after the movant meets the criteria of the rule, due process is violated.*

182.  Rule 3.853 gives courts full discretion in determining whether to grant testing. Courts are not required to grant testing even if a movant meets the requirements.

183.  The circuit court made findings that Mr. Duckett's initial motion for postconviction DNA testing, filed on February 27 following the signing of Mr. Duckett's execution warrant, met the pleading requirement of Rule 3.853. The court granted DNA testing and determined that "that identity was an issue at trial, and that if DNA testing of the sperm indicated that it did not belong to [Mr. Duckett], there would have been a reasonable probability of an acquittal." (WR1. 748). The State did not dispute the admissibility of the results (WR1. 747).

184.  Following the failed testing of the Q6(3) slide using unsuitable technology unable to produce a definitive result at the behest of the State, Mr. Duckett was left with no other choice to seek testing of the remaining

similar items.

185. Despite previously determining that Mr. Duckett met all three criteria of Rule 3.853, that identity is an issue and that probative results excluding Mr. Duckett could exonerate him, that the evidence at issue may have DNA, and that the evidence would be admissible at a trial, the circuit court denied testing of the additional items.

186. The State argued that Mr. Duckett failed to assert that the items to be tested contain biological material to be tested. The circuit court ignored Mr. Duckett's request for an evidentiary hearing, which was required because the record did not conclusively establish the State's assertion.

187. Florida's jurisprudence concerning DNA testing largely addresses the type of evidence would likely lead to exoneration. A vast majority of the appeals from DNA denials concern the denial of testing because the litigant has failed to show that the DNA results would lead to an acquittal. That is not the case here. Mr. Duckett is unaware of any other Florida DNA case wherein the court has denied testing in the same circumstances.

188. The court's interpretation of the DNA statute and case law

resulted in an improper denial of due process in violation of the Due Process Clause of the Fifth and Fourteenth Amendments.

C. *When the state court puts in place mechanism to analyze DNA but places an improper temporal limitation not contemplated by the rule due process is violated.*

189. In denying Mr. Ducket's request under Rule 3.853, the state courts violated fundamental fairness by improperly imposing a temporal limitation on the evidence to be considered that does not exist in the statute.

190. The state court denied Mr. Duckett's DNA request by asserting a procedural bar against him citing state caselaw, *Reynolds v. State*, 373 So. 3d 1124, 1126 (Fla. 2023). *Reynolds* purportedly precludes postconviction claims that could or should have been brought during prior proceedings, including testing of DNA items that were previously known but not raised. But Mr. Reynolds' case is not comparable as, contrary to Mr. Duckett, no court has ever agreed that DNA results could exonerate him and there is no changing that fact in Reynolds continuing to re-request DNA testing.

191. More importantly, reliance on *Reynolds* disregards the history and purpose of Rule 3.853, reads into the rule a temporal limitation that

does not exist, and misconstrues the very purpose of a procedural bar. Per the DNA Act, Mr. Duckett's requests for DNA testing have only been limited by the advancements in the technology, not by the courts. The State agreed in 2003 that the items should be tested but based on the technology at the time, no probative results were yielded. Now, with the advancements in technology, this evidence meets the requirements imposed by Rule 3.853 and Mr. Duckett believes a probative and exonerative result can be yielded from the times.

192. The history of Rule 3.853 reflects a deliberate recognition that postconviction DNA testing should not be constrained by arbitrary filing deadlines. When Rule 3.853 was initially passed, Florida litigants were provided only two years to move for testing. In 2004, that limitations period was extended to four years, and in 2005, it was eliminated entirely. In support of the change, the Florida Bar Criminal Rules Committee took the formal position that DNA testing must be a "meaningful component of Florida's criminal justice system—to help ensure that the real perpetrators of crimes are punished, that the freedom of innocent people is protected, and that the public's trust and confidence in the judicial process are not diminished." The elimination of

any filing deadline reflects the rule's purpose: to prioritize the truth-seeking function of DNA testing over procedural time bars where justice may depend on scientific evidence.

193. Imposing judicially created time limitations or applying procedural bars to foreclose otherwise meritorious requests undermines the legislative purpose by denying litigants access to the substantive rights the statute was enacted to secure. A procedural rule should not be construed or applied in a manner that effectively nullifies a substantive statutory right absent a clear expression of legislative intent. Construing Rule 3.853 to impose limitations not found in the statute would frustrate the remedial purpose of Florida's postconviction DNA testing framework and produce a result contrary to the intent of its authors, whose objective was to ensure access to potentially exculpatory DNA evidence rather than to erect procedural obstacles that prevent its consideration.

194. By refusing to consider a facially sufficient motion based on an extra-textual timeliness requirement, the state court effectively resurrected a limitations period that the Florida legislature deliberately abolished, thereby depriving Mr. Duckett of the procedural protections guaranteed by Rule 3.853 and violating due process.

83

II.    **Second Claim for Relief: Denial of access to courts**

195.  The First and Fourteenth Amendments guarantee litigants and criminal defendants access to courts. *See* U.S. Const. amends. I, XIV.

196.  Under this right, the State must make available the tools necessary for prisoners to obtain meaningful access to available judicial remedies. *Bounds v. Smith*, 430 U.S. 817, 828 (1977). State law must ensure that prisoners like Mr. Duckett have "adequate, effective, and meaningful" access to post-conviction remedies in order to vindicate this right. *Id.* (holding that prison authorities are required to provide inmates meaningful legal assistance or resources to ensure their constitutional right of access to courts be upheld).

197.  As alleged above, Mr. Duckett has available remedies under Florida law to access the courts to litigate his claims. He likewise has remedies under Florida law to access the appeal the denial of his Rule 3.853 proceedings, which the court improperly dismissed for lack of jurisdiction.

198.  Mr. Duckett has incurred actual injury when the State courts denied his request for an evidentiary hearing throughout his Rule 3.853 proceedings, and again when he was denied the opportunity to present

testimony from the experts that analyzed the inconclusive data obtained from DLI's testing, and as a result, he has been precluded from appealing the court's actions.

199.   Once the inconclusive testing was analyzed, the parties filed reports from both the State's expert, Parabon NanoLabs, and the defense expert, Dr. Mittelman of Othram (WR1-S2. 2330, 2342). The experts who analyzed the same testing results and underlying data disagreed on the ability to determine an outcome. As outlined in the expert Mr. Duckett retained, there are significant concerns regarding the validity of the State's findings, and insufficient information provided with the report to determine the scientific validity of the evaluation (WR1-S2. 2355).

200.   Mr. Duckett filed a Motion Requesting Evidentiary Hearing in the circuit court requested hold a hearing and take sworn testimony from the scientists to provide a full record of the testing that was conducted, the analyses that were done, and the support for the resulting conclusions (WR1-S. 2197). The lower court denied the motion.

201.   Mr. Duckett appealed to the Florida Supreme Court. Before a briefing schedule could issue, the State moved to dismiss Mr. Duckett's appeal citing lack of jurisdiction. Mtn. to Dismiss, SC2026-0959 (June 26,

2026).

202.   The Florida Supreme Court dismissed Mr. Duckett's appeal, citing lack of jurisdiction. The court, without permitting Mr. Duckett to brief his claims, determined that Mr. Duckett's request for an evidentiary hearing following the results of testing is not contemplated by the rule. Order, SC2026-0959 (July 1, 2026).

203.   The Florida courts' unreasonable interpretation of the law with respect to the court's jurisdiction to hear Mr. Duckett's appeal has prevented him from properly presenting the issues to the court.

204.   The appeal of Rule 3.853 proceedings squarely falls under the jurisdiction of the Florida Supreme Court. The court itself confirmed as much in its opinion following Mr. Duckett first appeal of the lower court's improper denial of his Rule 3.853 proceedings, "Section 925.11(3)(a) provides that '[a]n appeal from the court's order on the petition for postsentencing DNA testing may be taken by any adversely affected party.'" *Duckett v. State*, 431 So. 3d at 994. Both Rule 3.853 and Florida Rule of Appellate Procedure 9.140 entitle a defendant to appeal "orders denying relief." *Id.* (quoting Fla. R. App. P. 9.140(b)(1)(D)).

205.   In denying an evidentiary hearing, the court concluded Mr.

86

Duckett's Rule 3.853 proceedings, thereby bringing "'an end to the judicial labor.'" *Duckett*, 431 So. 3d at 995 (quoting *S.L.T. Warehouse Co. v. Webb*, 304 So. 2d 97, 99 (Fla. 1974)).

206. Florida courts interpretation of the rules and jurisprudence governing Rule 3.853 appeals resulted in an improper denial of due process and deprivation of access to the courts in violation of the Due Process Clause of the Fifth and Fourteenth Amendments.

**Request for Injunctive Relief: Release of Evidence for Testing**

207. For the reasons stated above, the Constitution requires declaratory relief that the denial of forensic testing to Mr. Duckett ahead of his scheduled execution violates the Constitution and that Mr. Duckett be afforded the opportunity to conduct forensic testing on the evidence identified in this Complaint. Further, Mr. Duckett requests injunctive relief compelling those Defendants who are custodians of the evidence identified in this Complaint to release the evidence designated below for testing. Accordingly, Mr. Duckett asks this Court to grant prospective injunctive relief compelling the Defendants to release the evidence identified in this Complaint so that the requested testing can be accomplished.

## PRAYER FOR RELIEF

208. WHEREFORE, Plaintiff James Aren Duckett prays that this Court provide relief as follows:

A.    A declaratory judgment that Florida Rule of Criminal Procedure 3.853, as applied by the Florida state courts, is unconstitutional under the First, Fifth, and Fourteenth Amendments to the U.S. Constitution because:

    i.    it impermissibly precludes the movant from contacting the DNA laboratory conducting the testing and likewise impermissibly precludes access to records necessary to the litigation of the DNA evidence;

    ii.    it imposes an arbitrary temporal limitation by refusing to consider successive motions;

    iii.    it discounts the significance of probative DNA results by allowing a court discretion to deny testing even if a movant has made a showing that the testing could lead to an acquittal;

    iv.    it permits summary dismissal of petitions that satisfy the statutory requirements on their face; and

    v.    it deprives petitioners of constitutionally protected liberty interests in using state procedures to demonstrate innocence, obtain reversal of convictions or reduction of sentences, obtain executive clemency, and enjoy adequate, effective, and meaningful access to the courts.

B.    A    preliminary    and    permanent    injunction    requiring Defendants to produce and release the following items for DNA sampling and subsequent comparison of any obtained profile to the profiles of Mr. Duckett and upload any suitable unmatched profile into CODIS pursuant to an appropriate protocol regarding chain of custody and preservation and return of such evidence after testing has been completed:

    i.    Exhibit 14 – Q6, Underwear

    ii.    Exhibit 4 – Q6(1), Underwear Cutting Extract

    iii.    Exhibit 4 – Q6(2), Underwear Cutting Extract

    iv.    Exhibit Q6-Q6#3, Cutting of Underwear

    v.    Exhibit Q5, Jeans

    vi.    Slides of Q5, Q6(1), and Q6(2), All smears (Identified as LCSO 56)

    vii.    Packaging from Exhibit 4 – Q43, Vaginal Swabs

    viii.    Packaging Exhibit 4 – Q43a, Vaginal Swabs

    ix.    Exhibit 14 – Q43, Vaginal Smear

    x.    Packaging from Q30/Q31, Fingernail scrapings

    xi.    Extracts from 2003 testing of underwear, jeans, and vaginal swabs, including Q202, DNA extract from underwear and #4, LCSO Item 131, DNA extracts from underwear.

    xii.    Tubes marked F13241 and F13422, also known as Q201, DNA Extracts from Underwear

C. A preliminary and permanent injunction prohibiting Defendants from executing Mr. Duckett until the testing in paragraph 208(B) above is completed and any requisite analysis of the testing data is complete;

D. All other relief the Court deems appropriate and necessary.

Dated: July 22, 2026                    Respectfully submitted,

                                        */s/ Brittney N. Lacy*
                                        BRITTNEY LACY
                                        Assistant CCRC-South
                                        Fla. Bar No. 116001
                                        *lacyb@ccsr.state.fl.us*

                                        */s/ Courtney M. Hammer*
                                        COURTNEY M. HAMMER
                                        Assistant CCRC-South
                                        Fla. Bar No. 1011328
                                        *hammerC@ccsr.state.fl.us*

                                        Capital Collateral Regional
                                        Counsel-South
                                        110 SE 6th Street, Suite 701
                                        Fort Lauderdale, FL 33301
                                        Tel. (954) 713-1284

                                        */s/ Mary E. Wells*
                                        MARY ELIZABETH WELLS

                                        Fla Bar. No. 0866067

                                        Law Office of M.E. Wells
                                        623 Grant Street SE

Atlanta, GA 30312
*mewells27@comcast.net*